Filed 2/28/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROBERT GEFFNER,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>BOARD OF PSYCHOLOGY,<br><br>        Defendant and Respondent. | B322991<br><br>(Los Angeles County<br>Super. Ct. No. 22STCP00012) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Reversed with directions.

        Klinedinst, Earll M. Pott and Robert M. Shaughnessy, for Plaintiff and Appellant.

        Rob Bonta, Attorney General, Gloria L. Castro, Assistant Attorney General, and Matthew M. Davis and Giovanni F. Mejia, Deputy Attorneys General, for Defendant and Respondent.

        Law Offices of Seth L. Goldstein, Seth L. Goldstein for Amicus Curiae on behalf of Plaintiff and Appellant.

The California Board of Psychology, Department of Consumer Affairs (the Board) revoked Dr. Robert Geffner's license after it found he violated the American Psychological Association's Ethical Principles of Psychologists and Code of Conduct (Ethical Standards)[1] by evaluating two children for suicidality without their father's consent, evaluating the children without consulting their existing therapist, making custodial recommendations that went beyond the scope of an emergency risk assessment, and delegating the duty to warn father that one child had thoughts about killing him.  Dr. Geffner petitioned for a writ of mandamus to vacate the Board's decision.  The trial court denied the petition.[2]  We now reverse the judgment denying his petition.

---

[1]  Business and Professions Code section 2936 requires the Board to "establish as its standards of ethical conduct relating to the practice of psychology, the 'Ethical Principles and Code of Conduct' published by the American Psychological Association (APA).  Those standards shall be applied by the board as the accepted standard of care in all licensing examination development and in all board enforcement policies and disciplinary case evaluations."  (See also American Psychology Assoc., Ethical Principles of Psychologists and Code of Conduct (Ethical Standards) <https://www.apa.org/ethics/code [as of Feb. 28, 2024], archived at <https://perma.cc/4TQ8-MZYN>.)

[2]  The Board also found that Dr. Geffner violated the Ethical Standards by relying on a colleague's interview of the children rather than by interviewing them himself, but the trial court did not uphold that finding.

# BACKGROUND

## I.     Dr. Geffner's evaluation

Mother and father have two children, Minor S. and Minor N., twins born in 2004. The parents separated when the twins were nine years old. A family court issued this order: "Both parents shall have access to information about the health and education of the children. Each parent shall be responsible to contact the school and medical provider to receive the information directly from the school and provider. **Notification of Medical Emergency:** In the event either child receives emergency medical treatment, the parent who arranges for this treatment shall notify the other parent as soon as is reasonably possible. Both parents shall place the name of both parents on any listings for **emergency contact** with any educational, activity, childcare, or medical provider."[3]

In 2016,[4] Dr. Geffner was a California licensed clinical psychologist who had been in practice for about 45 years. Although neither mother nor the children were Dr. Geffner's patients, mother called him on June 29 and told him that three weeks earlier she had overheard the children, who were then 12 years old, discussing killing themselves or father in connection with an upcoming court-ordered visit with father. Mother told the children's therapist, Lori Williams, about the children's threats, but Williams was going on vacation and said they could

---

[3]     Dr. Geffner asserts that the order, which also outlined a course of reunification visits with father, violated the Family Code. Whether it does is not before us and is irrelevant to the issues on appeal.

[4]     Unless otherwise noted, all dates refer to 2016.

3

discuss it after the upcoming July 4 holiday. Dr. Geffner asked mother basic questions, including about the children's custody arrangement. Mother reported that she and father had joint legal custody, she had sole physical custody, the children had a therapist, the family court had ordered the children to have supervised visitation and reunification with father, and there was an upcoming visit right after the holidays. Dr. Geffner advised mother to contact Williams.

On June 30, mother called Dr. Geffner again and said Williams had already left town. Dr. Geffner gave mother the names of two psychotherapists in the Bay Area, where mother lived.[5] After they told mother they were unavailable, mother again called Dr. Geffner, who contacted Dr. Juhayna Ajami, his former postdoctoral fellow who was in the Bay Area. On July 1, Drs. Geffner and Ajami agreed to collaboratively evaluate the children.

The next day, Saturday, July 2, Dr. Ajami met the children in person to evaluate them. Mother signed a consent form for the evaluation. The doctors did not seek or obtain father's consent. Mother reported that Minor S. had told her just the night before, July 1, that he was trying to figure out how to kill himself, but he had ruled out using a knife.

Minor S. told Dr. Ajami that every few weeks he wanted to kill himself and that seeing father triggered these feelings. He denied having a plan to kill himself, but he had contemplated stabbing himself or jumping off a cliff. One month earlier, he had scratched himself because he " 'needed to hit something or

---

[5]     Dr. Geffner was in San Diego.

4

scratch something.' " After a visit with father, Minor S. took a knife from a restaurant, intending to stab himself in the leg.

Minor N. said he first harbored suicidal thoughts when he started visiting father, and he thought about suicide just the night before, when father was mentioned in conversation. He had thought about hiring a hitman to kill father, but his plan had too many flaws; for example, "we would have to be in Los Angeles or Florida so we wouldn't be suspects." Minor N. denied having a current plan or intent to kill father. Instead, he said he would probably kill himself by using a knife or jumping off a building if he had to live with father. He thought that shooting himself would be best, " 'but it would probably hurt.' " Still, Minor N. wanted to live and go to college, and he cited other reasons he would not commit suicide: his mother, grandparents, and brother.

Dr. Ajami assessed the children using the Trauma Symptom Checklist for Children, which measures posttraumatic stress and related psychological symptomatology in children who have experienced traumatic events. Both children's scores on the depression scale suggested "possible subclinical (but significant) depressive symptomatology." They struggled with sadness, unhappiness, and loneliness; episodes of tearfulness; and "depressive cognitions such as guilt and self-denigration." Such elevations "on this clinical scale may be associated with suicidality or self-injurious behavior." The children endorsed wanting to hurt and to kill themselves "lots of times." On another assessment, the children endorsed statements about being sad and unsure things would work out, not liking themselves, feeling like crying many days, and feeling alone. Further, Minor N.'s Posttraumatic Stress scale was clinically

elevated, which suggested he was preoccupied with past traumatic events. His score on the anger scale suggested he was having angry thoughts and behavior, and mother corroborated that he lashed out at others. Minor N. endorsed wanting to hurt other people, which was consistent with his homicidal ideation toward father. And although Minor N. denied wanting to commit suicide during the interview, he was close to Minor S. and said they would commit suicide together. Therefore, "he should still be considered at a high risk for self-harm due to his brother's reported suicidal ideation." Both children reported increased symptoms, particularly suicidal ideation, around the time they are scheduled to see father.

The doctors prepared their Confidential Emergency Psychological Evaluation on July 3 and 4 and emailed it to mother on the evening of July 4. In addition to reporting the above interview and test results, the doctors noted that "children can have the intent to cause self-harm or death regardless of a full comprehension of the lethality or finality of the act. [Fn. omitted.] Therefore, they may engage in potentially dangerous behavior in an attempt to alleviate their emotional pain without fully understanding the consequences of their actions. Furthermore, they may accidentally engage in potentially lethal behavior towards themselves or others. As such, their disclosures of self-harm and harm to others should not be dismissed and should be taken seriously in order to ensure both their safety as well as the safety of others."

The doctors then made five recommendations: (1) the children "cease contact" with father until they had "more extensive treatment for their reported symptoms, and their risk for self-harm and harm to others is eliminated. Since they are

6

performing well in school, report a positive atmosphere in their maternal home, and the symptoms appear to be situation specific and related to contact with their father, outpatient trauma treatment at least weekly by a clinician specifically trained in dealing with child trauma is recommended"; (2) the children have more frequent treatment, at least once a week, and trauma-focused psychotherapy; (3) the children should undergo another risk assessment before reinstating contact with father and the current report should be provided to the children's therapist and relevant parties; (4) the length of treatment was unpredictable; and (5) within 24 hours father needed to be told about his children's feelings and statements about harming him—otherwise, the doctors would report it. The report further stated, "In addition, based upon this evaluation, it does not appear that either boy is at risk for suicidal potential or harm to others if they can be reassured that there will not be contact with their father, as this appears to be the strongest risk factor at this time."

During a family court appearance on July 5, mother gave Dr. Geffner's report to the court and father. Mother's attorney advised Dr. Geffner the same day that the report had been provided to father.

On July 7, father's lawyer informed Drs. Ajami and Geffner that father had joint legal custody of the children, the doctors had evaluated the children without father's knowledge or consent, the testing violated a court order, and father did not consent to the doctors treating or having any further contact with the children. Dr. Geffner had no further contact with the children.

Four days later, on July 11, Dr. Geffner wrote a follow-up letter at the request of mother's attorney. In that letter, he responded to questions posed by mother's attorney. The attorney

first asked whether a meeting between father and the children fell within Dr. Geffner's no-contact recommendation. In response, Dr. Geffner clarified that the no-contact recommendation would include a meeting with father and the children in a reunification session. Dr. Geffner also expressed concern about the trauma training and expertise of the therapist and mediator who had recommended a reunification meeting with father, suggesting that they "may be ignoring our emergency evaluation interviews and assessment measures" by forcing the children to meet with father. Second, the attorney asked what mother should do if the children made any further statements about harming themselves or others.
Dr. Geffner responded that mother should notify the children's therapist and take them to an emergency room or psychiatric clinic. Third, the attorney asked why the children needed specialized trauma treatment, and Dr. Geffner responded that they had elevated trauma symptoms. Also, Minor N. had "elevated his posttraumatic stress scale."

II.     The Board's accusation, trial, and decision

In July 2017, father filed a consumer complaint with the Board against Dr. Geffner. The Board then filed an accusation against Dr. Geffner charging him with gross negligence, repeated negligent acts, and violating the Ethical Standards, psychology licensing law, or regulations.[6]

---

[6]     The Board also filed an accusation against Dr. Ajami, but the proceedings against her are not at issue.

8

A.    *Hearing evidence*

At the August 2021 hearing on the accusation, Dr. Geffner and two experts testified, among others.

1.  Dr. Geffner's testimony

As to why he did not seek father's consent, Dr. Geffner testified that normally he would ask to see a custody agreement, but this was an emergency given the children's statements.  In his experience, the person having physical custody of a child can seek appropriate treatment if an emergency arises.  Further, it was clear that father was the trigger, so it was important to assess the threats.  Dr. Geffner did not refer the children to an emergency room because they had sufficient protective factors, such as family support.

Dr. Geffner also testified that mother told him that she had tried to contact the children's therapist, but the therapist was leaving town and was unavailable until after the holidays.  He asked mother to follow up with the therapist to let her know how serious the situation was and to see if she could do an emergency evaluation.  Mother called Dr. Geffner back and again said the therapist was unavailable, so Dr. Geffner gave her the names of two Bay Area psychologists.  Dr. Geffner confirmed that he did not personally try to contact the children's therapist because his focus was on the emergency, on whether the children posed a serious risk to themselves.  Had he been conducting a general forensic evaluation or general psychological evaluation, then he would have contacted the treating team.[7]

_____

[7]    In an interview Dr. Geffner gave to the Board before the hearing, he similarly testified that when mother first contacted

9

Dr. Geffner did not consider his assessment of the children to be a custody evaluation, which is a comprehensive evaluation with the goal of recommending what is in a child's best interests regarding access and visitation. Instead, he performed a one-time emergency evaluation or risk assessment. Given that this was an emergency, mother had physical custody of the children, and father triggered the children's feelings, Dr. Geffner's focus was on assessing the seriousness of the threats.

Dr. Geffner also concluded that there was no necessity for a child abuse report, given the children's and mother's denial of physical or sexual abuse. Further, his understanding of his duty to warn was there must be a serious risk of imminent violence to an identified victim by an identified perpetrator. That was not present here, because Minor N. did not have a realistic plan for hurting father. The children also had protective factors; for example, they did not want to die, they were doing well in school, and they had friends. Although the plans to hurt themselves were more realistic, the children's thoughts of self-harm were focused on seeing father. There was no risk "almost at all" if they did not have contact with father.

2. Expert testimony

Two experts testified at the hearing. Dr. Lisa Davidson, a clinical psychologist, neuropsychologist, and expert reviewer,

---

him, he had asked her to see if the children's therapist could conduct the emergency evaluation. However, mother reported that the therapist was out of town, and mother could not reach her. Dr. Geffner did not personally call the therapist to see if they had an emergency protocol, but when he asked mother if the therapist worked with someone else who could see the children, mother indicated there was no one else.

testified for the Board. Dr. Eugune Roeder, a psychologist who had been an expert reviewer for the Board for 30 years, testified for Dr. Geffner. Both experts agreed that the purpose of an emergency evaluation is to determine whether there is an imminent risk of harm. They otherwise testified as follows.

### 3. Dr. Davidson's testimony

As to informed consent, Dr. Davidson said that on having received this referral, she would have determined the custodial arrangement, because "you need to have both parents' blessing to proceed with their children." The failure to obtain father's consent was an extreme departure from the standard of care.

Dr. Geffner's failure to reach out to the children's treating professionals also was an extreme departure from the standard of care. They could have provided a "well-rounded perspective and a complete analysis" of the children. Dr. Geffner should not have relied on mother's representation that the children's therapist was unavailable because "you want to be sure that you were doing your due diligence."

Dr. Davidson testified that in performing an emergency evaluation, the focus of the recommendations is on what will keep the children "safe and keep others safe. So it's the homicide and suicide risk." Dr. Geffner's recommendation that the children and father have no contact was inconsistent with an emergency evaluation and instead was "a long-term ramification based on limited information" and addressed more than the immediate need. Dr. Davidson thus viewed the evaluation as a custody evaluation. Similarly, Dr. Geffner's July 11 follow-up letter was outside the appropriate timeframe for an emergency psychological evaluation.

Also, the emergency evaluation did not occur in an appropriate timeframe, because mother called Dr. Geffner on June 29 but the clinical interviews were not conducted until July 2, and the report was prepared the following day.

The standard of care requires psychologists to notify someone if a threat of harm has been made against them. Because the threat was to father, Dr. Geffner had a duty to warn even if the threat was not realistic and there was no imminent risk of violence. It was the psychologist's duty to give the warning, not mother's.[8]

The standard of care also required Dr. Geffner to meet with the children to conduct any purported emergency evaluation. He could not rely on another psychologist to perform the clinical interviews or other functions.

### 4. Dr. Roeder's testimony

Dr. Roeder generally opined that neither Dr. Geffner nor Dr. Ajami violated the Ethical Standards or engaged in any extreme departure from a standard of care.

As to the specific issue of parental consent, Dr. Roeder agreed that typically it is appropriate to inform both parents before conducting an evaluation, except when there is an emergency situation and doing so would not benefit the child. Here, the concern with notifying father was that the children had identified him as the trigger for their suicidal emotions. Further, he disagreed that Dr. Geffner should have referred the children

---

[8] Dr. Davidson also opined that a report of child abuse should have been made against father because "basically the outcome of the report yielded a result that would indicate that the father was definitely doing some sort of harm to his children."

12

to an emergency room, as this was more of a psychological emergency. Also, his reading of the custody order required the other parent to be informed within a reasonable time of the children receiving emergency care, and here, the psychologists required father be informed within 24 hours.

Next, he did not agree that Dr. Geffner performed a child custody evaluation or made recommendations regarding custody. A custody evaluation would be "dramatically more extensive" and would include parenting history and abilities and recommend a parenting plan.

Nor did Dr. Roeder agree that Dr. Geffner had an obligation under the circumstances to consult the children's treatment team before or during his evaluation. While Dr. Roeder agreed "it would definitely be best to consult with the treaters" when conducting this type of evaluation, here, the treaters were unavailable. Given that, Dr. Geffner's lack of contact with the treatment team was within the standard of care.

Dr. Roeder did not consider the child's threat to hire an out-of-state hitman to be a realistic threat of violence. A risk of serious violence did not exist when the evaluation was done, but it could occur if the children were forced to spend time with father.

B.    *The Board's decision*

The Board issued a decision that became effective in December 2021. The Board found that the experts agreed an "emergency evaluation is performed to identify whether there is an imminent risk of harm, and if so to identify what interventions are necessary. An emergency evaluation is not a custody evaluation and is not a comprehensive psychological evaluation."

13

As to the specific issues, the Board found Dr. Davidson's opinions more persuasive and consistent with the evidence. Accordingly, the Board found that Dr. Geffner violated the Ethical Standards in five ways.

First, Ethical Standards 3.10 and 9.03 require psychologists to obtain informed consent before performing assessments. The evidence showed that Dr. Geffner could have obtained father's consent because the evaluation was arranged over several days "and was not of such an emergency nature that Father could not have been contacted," father had a right to be contacted per the court order, and the doctor continued to be involved in the matter (presumably by responding to mother's lawyer's questions) after being told father did not consent.

Second, Dr. Geffner failed to consult the children's existing providers, in violation of Ethical Standard 3.09, which requires psychologists to coordinate care with other professionals when indicated and appropriate. Relying on Dr. Davidson's opinion, the Board found that Dr. Geffner unreasonably accepted without question mother's representation that the children's therapist was unavailable. The Board also noted that Dr. Davidson had said most professionals have emergency protocols in place if they are unavailable. And even Dr. Roeder agreed it was " 'best' " to consult existing treating professions before performing an evaluation.

Third, the report exceeded the scope of an emergency evaluation, which is to identify an imminent risk. The report was not limited to an imminent risk assessment and instead included recommendations implicating parental visitation and future treatment, akin to a custody evaluation. "The reports made

14

specific recommendations regarding parental contact that were not appropriate for an emergency evaluation."

Fourth, Dr. Geffner departed from the standard of care by issuing two reports containing psychological assessments and recommendations without personally assessing the children and without making it explicit he had not done so.

Finally, Dr. Geffner had a duty to warn father personally of Minor N.'s homicidal ideation, and the doctor should not have relied on mother to warn father. His actions violated Ethical Standard 3.04, which requires psychologists to take reasonable steps to avoid harming patients to minimize foreseeable harm.

The Board accordingly found Dr. Geffner had committed gross negligence. It revoked his license but stayed revocation and placed him on five years' probation on various terms and conditions.

III.    Dr. Geffner petitions for a writ of administrative mandamus

Dr. Geffner petitioned for a writ of administrative mandamus to set aside and vacate the Board's decision. In June 2023, the trial court issued its judgment denying the petition. Exercising its independent judgment, the trial court, as an initial matter, rejected Dr. Geffner's assertion that the Board's decision was legally insufficient because it did not explain the administrative law judge's reasoning. As to the Board's five findings, the trial court found as follows.

First, the weight of the evidence supported the finding that Dr. Geffner conducted a psychological assessment of the children when there was no "true emergency," as evidenced by the troubling statements having been made three weeks before mother contacted the doctor. There was no evidence showing

that the doctor did not have time to contact father before evaluating the children.  That the doctor believed father was the "trigger" did "not inform on whether [Dr. Geffner] should have obtained Father's consent to assess" the children, as the children did not need to be told father had been informed.

Second, the weight of the evidence supported the finding that Dr. Geffner failed to try to contact Williams and that this failure was an extreme departure from the standard of care and violated Ethical Standard 3.09.  The trial court noted that Dr.  Roeder had agreed it would have been best to contact Williams but excused Dr. Geffner's failure to "do so in deferential reliance on Mother's statement of unavailability."  However, as Dr. Davidson explained, Dr. Geffner should have independently tried to contact Williams, given the contentious child custody proceedings.  "As a matter of common sense, independent verification would effectively [ ] rule out any possibility of motives related to [the] contentious child custody dispute."  Also, Williams could have provided information that would have informed Dr. Geffner's evaluation.

Third, Dr. Geffner's report went beyond a simple risk assessment of dangers from the children's homicidal and suicidal ideations.  Although not labeled as recommendations concerning parenting or custody, the report recommended no contact with father, which "is effectively a general and long-term recommendation for complete physical custody with Mother pending some further event; it addresses Father's access to the children.  [Citation.]  A recommendation of no contact with Father is not merely about *immediate* risk and *immediate* need.  [Citation.]  [Dr. Geffner's] recommendations through an emergency assessment that addressed more than the need to

16

cancel Father's *next* scheduled visit because of risk to the Boys breached the standard of care and the departure was extreme."

Fourth, the trial court rejected Dr. Geffner's argument that he did not have a duty to warn father of Minor N.'s homicidal ideation because the risk was not realistic. The argument was inconsistent with the report's recommendation that father be told about it within 24 hours. The duty to warn was not delegable to mother.

Fifth, the trial court reversed the finding that Dr. Geffner's failure to meet the children personally and reliance on Dr. Ajami's interviews breached the standard of care.

Dr. Geffner timely appealed.

## DISCUSSION

### I. Standard of review

In ruling on a petition for a writ of administrative mandate, the trial court reviews the administrative record to determine (1) whether the administrative agency exceeded its jurisdiction, (2) whether there was a fair trial, and (3) whether there was any prejudicial abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b).) An abuse of discretion is established if the administrative agency has not proceeded in the manner required by law, the order or decision is not supported by the findings, "or the findings are not supported by the evidence." (*Ibid.*)

When reviewing an agency's findings in a professional licensing discipline proceeding, the trial court " 'exercise[s] its *independent judgment* on the facts, as well as on the law . . . .' " (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 811–812 (*Fukuda*), italics added; see also *Estrada v. Public Employees' Retirement System* (2023) 95 Cal.App.5th 870, 881.) Under the

17

independent judgment standard, " ' "[t]he findings of the [agency] come before the court with a strong presumption of their correctness, and the burden rests on the complaining party to convince the court that the [agency]'s decision is contrary to the weight of the evidence." ' (*Fukuda, supra*, 20 Cal.4th at p. 812.)" (*Front Line Motor Cars v. Webb* (2019) 35 Cal.App.5th 153, 160, italics omitted.)  Nonetheless, while the trial court begins its review with a presumption that the administrative findings are correct, " 'it is only a presumption, and may be overcome. Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings.' (*Fukuda*, at p. 818.)" (*Land v. California Unemployment Ins. Appeals Board* (2020) 54 Cal.App.5th 127, 139; see also *Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 626 (*Cassidy*) [" 'The scope of the trial before the superior court is not an unqualified or unlimited trial de novo, but the trial proceeds upon a consideration of the record of the administrative proceedings which is received in evidence and marked as an exhibit' "].)

" 'On appeal from a decision of a trial court applying its independent judgment, we review the trial court's findings rather than those of the administrative agency.' " (*Yazdi v. Dental Bd. of California* (2020) 57 Cal.App.5th 25, 32.)  We review the trial court's findings under the substantial evidence test and determine whether substantial evidence supports the trial court's conclusions.  (*Fukuda, supra*, 20 Cal.4th at p. 824; *Yazdi*, at p. 32; *Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 574–575; *Cassidy, supra*, 220 Cal.App.4th at p. 627.)  However, we are not bound by any legal interpretations made by the

18

administrative agency or the trial court; rather, we make an independent review of any questions of law, such as whether the agency failed to comply with required procedures or applied an incorrect legal standard. (*Rand*, at pp. 574–575; *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 479.)

II.     The Board's decision is not ambiguous or conclusory

As an initial matter, Dr. Geffner contends that the Board's decision failed to comply with Code of Civil Procedure section 1094.5 because it was ambiguous and conclusory. We disagree.

Code of Civil Procedure section 1094.5 requires an agency to set forth findings in its decision that bridge the analytic gap between the evidence and the ultimate decision or order. (*Topanga Ass'n for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514–515 (*Topanga*).) This findings requirement "serves to conduce the administrative body to draw legally relevant sub-conclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions." (*Id.* at p. 516.) Further, the "findings enable the reviewing court to trace and examine the agency's mode of analysis." (*Ibid.*; see also *Oduyale v. California State Bd. of Pharmacy* (2019) 41 Cal.App.5th 101, 113 [agency must provide reasoned progression from factual findings to justify penalty imposed, including a statement of factual and legal basis for the decision].) Although the findings need not be extensive or detailed, mere conclusory findings without reference to the record are inadequate. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection, supra*, 44 Cal.4th at p. 517.)

19

Citing *Topanga*, Dr. Geffner contends that the Board failed to link its conclusions to the evidence. To support this contention, he primarily cites evidence he thinks the Board should have addressed and ignores evidence the Board did address. But, as the trial court observed below, Dr. Geffner's contention rests on an incomplete reading of the Board's decision. On the issue of father's consent, for example, the Board found Dr. Davidson's opinion more persuasive *based on* evidence that the evaluation was arranged over several days, psychological assessments were performed, and a court order gave father the right to be informed of health matters. Thus, the Board supported its conclusion (Dr. Geffner should have sought or obtained father's consent to the evaluation) with cited evidence (timing of evaluation, nature of emergency, and court order).

Otherwise, Dr. Geffner's contention that the Board's decision violates *Topanga* is largely an off-topic critique of Dr. Davidson's testimony, rather than a clear explanation of where the supposed gaps between the evidence and the Board's conclusions lie. For example, he criticizes Dr. Davidson's background, faults the Board for not explaining why Dr. Davidson's alternative to treating the children (referral to an emergency room) was superior to what he did (performing an outpatient risk assessment), and argues he had no legal duty to report father to Child Protective Services, was not required to obtain father's consent under the family court order, and had no duty to warn father of Minor N.'s homicidal ideations. Dr. Geffner concludes by calling Dr. Davidson's testimony a "sophomoric, internally inconsistent critique of Doctor Geffner's conduct, that misrepresented facts and misapplied the law."

20

In short, Dr. Geffner attempts to relitigate evidentiary and legal issues having nothing to do with *Topanga*'s procedural dictates about what must be in an agency's decision. Such issues are better addressed in his substantive argument about the sufficiency of the evidence and the law. We now turn to those issues.

III.    Father's consent

The trial court found that Dr. Geffner violated Ethical Standards 3.10 and 9.03 by failing to obtain father's consent before evaluating the children. Neither the Ethical Standards nor the evidence supports that conclusion.

Ethical Standard 3.10 requires psychologists conducting research or providing assessment therapy, counseling, or consulting services to obtain "the informed consent of the individual or individuals using language that is reasonably understandable to that person," except when consent is not required by law or otherwise per the Ethical Standards. "For persons who are legally incapable of giving informed consent, psychologists nevertheless (1) provide an appropriate explanation, (2) seek the individual's assent, (3) consider such persons' preferences and best interests, and (4) obtain appropriate permission from a legally authorized person, if such substitute consent is permitted or required by law. When consent by a legally authorized person is not permitted or required by law, psychologists take reasonable steps to protect the individual's rights and welfare." (*Ibid.*)

Ethical Standard 9.03, subdivision (a), provides that psychologists must obtain informed consent as described in Ethical Standard 3.10 "except when (1) testing is mandated by law or governmental regulation; (2) informed consent is implied

21

because testing is conducted as a routine educational, institutional, or organizational activity . . . ; or (3) [a] purpose of the testing is to evaluate decisional capacity."

These Ethical Standards thus require psychologists to obtain informed consent before conducting an assessment. However, they do not clarify who is a legally authorized person whose consent must be sought where, as here, minors and exigent circumstances are involved. The general rule as to minors is a parent or guardian has authority to consent to medical treatment for them. (See *Cobbs v. Grant* (1972) 8 Cal.3d 229, 244.)

In the present case, the trial court, parties, and amicus agree that father's consent was unnecessary if this was an emergency. Stated otherwise, mother alone could consent if the children's suicidal and homicidal ideations constituted an emergency. The trial court thus found that Dr. Geffner had to obtain father's consent because the circumstances were not an emergency, stating, "[N]othing suggests when there is no emergency—as here—[Dr. Geffner] could ethically proceed with an assessment without both Mother and Father's consent."[9] The trial court further said that the weight of the evidence supported the Board's finding that Dr. Geffner "elected to conduct a psychological assessment of minor children where there was *no true emergency*." (Italics added.)

Even though courts have recognized that it is hard to define "emergency" and that what constitutes an emergency may vary depending on the context, the trial court's finding that no

---

[9] The Board similarly characterized the situation as "not of *such* an emergency nature that Father could not have been contacted." (Italics added.)

"true emergency" existed under these circumstances finds little support in the law or evidence. *Bryant v. Bakshandeh* (1991) 226 Cal.App.3d 1241 considered what is an emergency in a medical context. In that case, a physician claimed he was exempt from liability for a patient's death under Good Samaritan laws because he provided medical care in response to a medical emergency.[10] The court said that the test for determining the existence of an emergency is an objective one, based on whether the undisputed facts " 'establish the existence of an exigency of "so pressing a character that some kind of action must be taken." ' " (*Id.* at p. 1247; see also *Valdez v. Costco Wholesale Corp.* (2022) 85 Cal.App.5th 466, 474 [undisputed facts established that fistfight was an emergency under Good Samaritan law].) In a similar context, Justice Croskey observed, "It would seem obvious that in determining whether a patient's condition constitutes such an emergency the trier of fact must consider the gravity, the certainty, and the immediacy of the consequences to be expected if no action is taken. However, beyond observing that these are the relevant considerations, the variety of situations that would qualify as emergencies under any reasonable set of criteria is too great to admit of anything approaching a bright line rule as to just how grave, how certain, and how immediate such consequences have to be." (*Breazeal v. Henry Mayo Newhall Memorial Hospital* (1991) 234 Cal.App.3d 1329, 1338.) Applying

---

[10] The Good Samaritan law defines " 'emergency medical services' " and " 'emergency medical care' " as those "medical services required for the immediate diagnosis and treatment of medical conditions which, if not immediately diagnosed and treated, could lead to serious physical or mental disability or death." (Health & Saf. Code, § 1799.110, subd. (b).)

these standards, emergencies have been found where the consequences of inaction ranged from an immediate certainty of death to a high probability of future risk of serious injury.  (*Ibid.*)

In this case, *nobody* testified that there was no risk of serious injury to the children based on their suicidal and homicidal ideations.  Yet, in finding that no "true emergency" existed, the trial court cited Dr. Davidson's testimony, even though she did not testify that exigent circumstances were absent.  To the contrary, she said, "So in this matter, I would have—if there was homicide or suicide at all in this, any type of risk, *which we did determine from the notes that there—there appeared to be, you know, risk factors there*, then I would have recommended that mother take them immediately to" an emergency room or psychiatry program, "somewhere to get properly evaluated.  That's an emergency evaluation." (Italics added.)  On cross-examination, Dr. Davidson agreed that an "emergency evaluation that involves homicide or suicide risk is usually then sent out to that type of agency (emergency services) if there's imminent risk."  Finally, in her written report to the Board evaluating Drs. Ajami and Geffner, Dr. Davidson characterized the situation with the children as "an emergent one," noting that it was "unusual a comprehensive psychological evaluation would be conducted in a time of emergency and need," and said that "[c]learly in this matter, *an emergency suicide/homicide situation for the . . . brothers appeared*." (Italics added.)

Dr. Davidson thus *agreed* that the children exhibited risk factors and that this was an emergency situation.  At no time did she say it was not an emergency.  Instead, she said she would

have managed the emergency differently, by referring the children to an emergency room and not preparing a report. Dr. Davidson said that an emergency evaluation is an "on the spot determination" and not "an emergency pscyh eval that has a report attached to it like this." She therefore did not agree with *how* Dr. Geffner conducted the emergency evaluation. That is not the same as concluding that 12-year-old children expressing persistent suicidal and homicidal ideations do not present an imminent risk of harm to themselves or others.

Dr. Geffner, however, was not disciplined for conducting an outpatient emergency evaluation: he was disciplined for not obtaining father's consent. Dr. Davidson's opinion that Dr. Geffner should not have conducted an outpatient emergency evaluation and instead should have sent the children to an emergency room fails to speak to the consent issue and thus was not substantial evidence supporting the trial court's conclusion Dr. Geffner violated the Ethical Standards by failing to obtain father's consent to the emergency evaluation.

As to the issue for which Dr. Geffner was disciplined, Dr. Roeder testified that typically it is appropriate to inform both parents before conducting an evaluation, *except* in an emergency situation, which exists where there is some kind of imminent risk of self-harm or harm to others. He said this was an emergency situation and that the emergency evaluation could be conducted on an outpatient basis. Neither his testimony nor Dr. Davidson's, therefore, supported the trial court's finding that no true emergency existed. To the contrary, the experts agreed an emergency existed; their disagreement was about how to handle it.

Nor does the other evidence the trial court cited support its finding that this was not an emergency. The trial court suggested this was not an emergency because Dr. Geffner waited three days to evaluate the children. That is, mother first contacted Dr. Geffner on June 29, several weeks after mother heard the children discussing suicide and homicide, and the evaluation didn't occur until July 2. However, when mother first called Dr. Geffner on June 29, he advised her to call Williams. When Williams was unavailable, the doctor referred mother to two Bay Area psychologists. After mother reported back to Dr. Geffner that they too were unavailable, he agreed *on July 1* to evaluate the children. The evaluation occurred *the next day*, on July 2. It is unclear why this was not an immediate evaluation or how the evaluation's timing shows that the circumstances were not exigent.

The trial court also suggested that this was not an immediate, "on the spot" assessment because Dr. Geffner wrote a report and did not recommend hospitalization. Although the trial court's reasoning is unclear, it apparently thought that a "true emergency" does not allow time to write a report and requires hospitalization. This analysis suggests that Dr. Geffner should have known *before* he conducted his assessment the facts he learned *as a result of* conducting it. Dr. Geffner was presented with facts suggesting the children might be at risk of self-harm. He therefore evaluated them within 24 hours and determined they were not at risk of imminent harm so long as they had no contact with father. That he *ultimately* decided there was no imminent risk requiring hospitalization if the children did not have contact with father and wrote a report detailing his

reasoning is not evidence there were no grounds for an emergency evaluation in the first instance.

Also, nothing in the record shows and no party suggests that had Dr. Geffner believed on July 1 when he was engaged or on July 2 when Dr. Ajami evaluated the children that they were at imminent risk of self-harm that he would have nonetheless tarried even a minute to write the report instead of immediately telling mother, for example, to take the children to an appropriate facility. In fact, Dr. Ajami testified that they determined the children were safe until they could see her on July 2, and "we don't send somebody to the emergency room or call the police if there's just suicidal ideation. There has to be imminent harm or imminent risk of harm" because "it's actually quite traumatic to send anybody, let alone children, to the emergency room." As to this, amicus aptly observes that mental health emergencies may require "swift action," even if the situation does not call for " 'code blue' 'lights and sirens.' An individual may be in such suicidal psychic pain on Friday night that it is not reasonable to wait until Monday, but the situation may be dealt with over the course of hours or a day or two and still be an emergency."

Further, the trial court appeared to connect the fact that the children made the troubling statements several weeks before mother called Dr. Geffner with the absence of an emergency. There is no basis for such a connection. It is undisputed that 12-year old children involved in a tumultuous familial relationship had said they wanted to kill themselves, one child wanted to kill father, and these sentiments were connected to an upcoming visit with father. No party or witness at any time has suggested these statements were, for lack of better terms, not serious, farcical, or

27

unworthy of being treated with the utmost gravity. To the contrary, the Board's expert agreed that the children exhibited risk factors.

Moreover, the record shows that the children continued to make troubling statements shortly before and during the July 2 assessment. Dr. Geffner reported that Minor S. told mother the night before the evaluation that he would rather kill himself than visit father, and he was trying to figure out a way to do it. The trial court discounted Dr. Roeder's testimony that the children's suicidal talk was ongoing, finding the foundation for it "unclear." But the foundation for the testimony was clear: it was in Dr. Geffner's report. In fact, the Board on appeal acknowledges the evidence, albeit relegating it to a footnote.

And although the record does not show Dr. Geffner knew when mother first contacted him that the children had more recently expressed suicidal thoughts and had acted on them, the July 2 interviews with them buttressed his initial assessment that this was an emergency. Minor S. told Dr. Ajami he thought about killing himself every few weeks, had contemplated suicide by stabbing himself or jumping off a cliff, had engaged in self-harm one month earlier, and had taken a knife from a restaurant, intending to stab himself after a visit with father. Minor N. similarly told Dr. Ajami he had last thought of suicide the night before, when his father was mentioned in conversation. As Dr. Ajami testified, any inconsistency about when the children last expressed suicidal thoughts—whether "yesterday" or a "few days ago"—did not change the "risk level," when there was consistency across all other data points.

Nor does Dr. Geffner's July 11 letter show that the situation was not an emergency. The trial court found it notable

that Dr. Geffner advised in the letter that mother should take the children to an emergency room if they made any *further* suicidal statement. That recommendation does not undermine the exigent nature of the children's circumstances when mother contacted Dr. Geffner.

Although we do not agree with the trial court's conclusion that no true emergency existed, we do agree with the trial court that the family court order is largely irrelevant to that issue. The order simply established that mother and father had joint legal custody of the children, meaning they shared the right and responsibility to make decisions about their children's health, education, and welfare. (Fam. Code, § 3003; see also *id.*, § 3083 ["In making an order of joint legal custody, the court shall specify the circumstances under which the consent of both parents is required to be obtained in order to exercise legal control of the child and the consequences of the failure to obtain mutual consent. In all other circumstances, either parent acting alone may exercise legal control of the child. An order of joint legal custody shall not be construed to permit an action that is inconsistent with the physical custody order unless the action is expressly authorized by the court."].) The order therefore generally gave both parents the right to make medical decisions, but it did not require Dr. Geffner to obtain father's consent before evaluating the children. As the trial court found, the family court order did not require consent from both parents for "*emergency medical treatment.*" It required a parent—not Dr. Geffner—to notify the other parent as soon as reasonably possible that a child had received emergency medical treatment. That happened here: mother gave the report to father on July 5, the day after it was prepared.

Finally, we agree with the trial court that neither it nor we have occasion to address whether the children could themselves consent to the evaluation. (See generally Fam. Code, § 6924, subd. (b) [minor 12 years of age or older "may consent to mental health treatment or counseling on an outpatient basis" if in a professional person's opinion the minor "is mature enough to participate intelligently in" the services and would "present a danger of serious physical or mental harm to self or to others without the mental health treatment or counseling"]; Health & Saf. Code, § 124260, subd. (b)(1) [minor 12 years of age or older may consent to mental health treatment or counseling if a professional person opines that minor is mature enough to participate intelligently]; see Fam. Code, § 6922 [citing circumstances minors 15 years of age or older may consent to medical care].) A petitioner in mandate must exhaust remedies and issues at every level of the administrative process, and failing to do so precludes petitioner from raising those issues during judicial review. (*Danser v. Public Employees' Retirement System* (2015) 240 Cal.App.4th 885, 891; *California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1489.) Dr. Geffner did not raise the issue before the Board, and it was not developed either legally or factually.[11]

IV.    Failure to consult the children's therapist

The Board and trial court found that Dr. Geffner violated Ethical Standard 3.09 by failing to contact Williams, the

---

[11]    Dr. Geffner's report did state that the "nature and purpose of the evaluation was explained to both [Minor N.] and [Minor S.] individually and assent was obtained."

children's therapist before seeing the children.  We disagree that there is sufficient evidence he violated that Ethical Standard.

Ethical Standard 3.09 provides:  "*When indicated and professionally appropriate*, psychologists cooperate with other professionals in order to serve their clients/patients effectively and appropriately." (Italics added.)  Further the Introduction to the Ethical Standards note they are "written broadly," and the application of any Ethical Standard "may vary depending on the context."  Also, the "modifiers used in some of the standards of this Ethics Code (*e.g., reasonably, appropriate, potentially*) are included in the standards when they would (1) allow professional judgment on the part of psychologists." (Italics added.)

The proper construction of the Ethical Standard is an issue of law that we resolve de novo, applying the rules of statutory interpretation.  (See *O'Brien v. Regents of University of California* (2023) 92 Cal.App.5th 1099, 1117 [applying general rules of statutory interpretation to university's Faculty Code of Conduct].)  We therefore give the Ethical Standard its plain, commonsense meaning, reading it as a whole. (*Ibid.*)  When language is clear and unambiguous and not reasonably susceptible to more than one meaning, there is no need for further construction.  (*People v. Camarillo* (2000) 84 Cal.App.4th 1386, 1391.)

The plain, commonsense interpretation of Ethical Standard 3.09's opening clause—"[w]hen indicated and professionally appropriate"—implicates some level of discretion.  The Introduction to the Ethical Standards as a whole confirms this interpretation, because it provides that the word "appropriate" refers to a psychologist's ability to exercise professional judgment.  Thus, psychologists have discretion whether to

31

cooperate or to consult with other professionals based on whether such consultation is indicated and professionally appropriate. Dr. Roeder accordingly testified that generally the best practice is to consult treating physicians, but here the children's existing treater was unavailable. Dr. Geffner similarly explained that after mother told him the children's therapist was unavailable, he did not try to contact her personally because, unlike in a forensic evaluation, his focus was on the emergency and whether the children posed a serious risk to themselves. Also, mother had told him the therapist was unavailable and there was no one else who could see the children.

In contrast, the Board's expert testified that a treating doctor should be consulted in all circumstances, including emergency ones, "[a]t the outset."[12] She therefore essentially said that such consultation is always indicated and professionally appropriate. In her view, Ethical Standard 3.09 affords psychologists no discretion. But this view is contrary to the opening clause in Ethical Standard 3.09 and the Introduction to the Ethical Standards as a whole, which neither the Board's expert nor the trial court directly addressed. Stated otherwise, Ethical Standard 3.09 is not reasonably susceptible to Dr. Davidson's interpretation of it. Given that Ethical Standard 3.09 does *not* require psychologists to consult treating doctors in all situations and that Dr. Davidson said, to the contrary, that such consultation is always required, there is insufficient

---

[12] Dr. Davidson also testified that there was an initial problem here because Dr. Geffner had to obtain father's permission to contact the treating team. We have already rejected that father's consent was required.

32

evidence to support the trial court's conclusion that Dr. Geffner violated the Ethical Standard.

V.    Failure to limit report to emergency risk assessment

The experts agreed that a risk assessment should be limited to identifying any imminent risk of harm and immediate intervention and should not make long-term custody recommendations.  The trial court interpreted Dr. Geffner's report as going beyond recommending what was immediately necessary to treat the children's suicidal and homicidal ideations by including custody recommendations, which violated the standard of care.

The trial court focused on Dr. Geffner's recommendation that the children cease contact with father until they received more extensive treatment for their symptoms and their risk for self-harm and harm to others was eliminated.  Adopting the testimony of Dr. Davidson, the trial court described the no-contact recommendation as practically a "general and long-term recommendation for complete physical custody with Mother pending some further event; it addresses Father's access to children.  [Citation.]  A recommendation of no contact with Father is not merely about *immediate* risk and *immediate* need. [Citation.]  [Dr. Geffner's] recommendation through an emergency assessment that addressed more than the need to cancel Father's *next* visit because of risk to the Boys breached the standard of care and the departure was extreme."

To be sure, Dr. Geffner's recommendation the children have no contact with father until their suicidal and homicidal ideations were eliminated (because father triggered those feelings) *implicated* whether they should see father in the immediate and perhaps longer term.  But that does not make it a *custodial*

33

*recommendation*, i.e., a recommendation mother should be granted sole legal and/or physical custody.[13] Dr. Geffner was evaluating whether the children were at imminent risk of self-harm or of harming others. He found that seeing father made the children want to kill themselves or father. How was Dr. Geffner supposed to phrase his medical opinion that seeing father triggered the children's suicidal and homicidal ideations—that is, placed them at risk of harm—without raising the inference or implication they should not see father until those ideations could be resolved? Was he supposed to simply state, "Seeing father triggers the children's suicidal and homicidal ideation?" If so, how does that simple statement also not implicate or suggest they should not have contact with father? In short, "no contact with father" is substantively no different than saying there is an imminent risk the children will harm themselves if they have to see father.

We therefore conclude that there is insufficient evidence to support the trial court's finding that Dr. Geffner made custody recommendations.[14]

VI.     Failure to warn father of Minor N.'s homicidal ideation

Dr. Geffner contends he did not violate any Ethical Standard by delegating a duty to warn father that Minor N. had considered killing him. We agree.

---

[13]     Mother gave the report to the family court, which excluded it.

[14]     We need not address Dr. Geffner's other recommendations because neither the Board nor the trial court found that they violated the standard of care governing what may be in an emergency risk assessment.

34

Here, the trial court found that Dr. Geffner breached a duty under Ethical Standard 3.04 to warn father by delegating the duty to mother. As an initial matter, Dr. Geffner did not delegate any duty *to mother*. Instead, he stated in the report, "As psychologists, we also have a duty to warn if potential harm may occur to others. *Therefore, we will need to be assured within 24 hours that [father] has been made aware of his son's feelings and statements with respect to possible harm to him. Otherwise, we will need to report it.* In addition, based upon this evaluation, it does not appear that either boy is at risk for suicidal potential or harm to others if they can be reassured that there will not be contact with their father, as this appears to be the strongest risk factor at this time." (Italics added.) As the italicized language shows, Dr. Geffner did not dictate that mother tell father, he just said father had to be told.

In any event, having independently reviewed Ethical Standard No. 3.04, we cannot conclude it required Dr. Geffner to warn father of his son's threat. Subdivision (a) of that standard directs psychologists to (1) "take reasonable steps to avoid harming" patients, and (2) "to minimize harm where it is foreseeable and unavoidable."[15] The first clause thus prohibits psychologists from inflicting harm themselves, but it does not directly concern a duty to warn *others* of potential harm. The second clause arguably includes a duty to warn third parties of threatened harm by a patient, but only if such harm is "foreseeable" and "unavoidable."

---

[15] Subdivision (b) forbids psychologists from harming others by engaging in torture, thereby underscoring that the focus of the Ethical Standard is on psychologists themselves not inflicting harm.

The evidence before the trial court does not demonstrate that harm to father was either foreseeable or unavoidable. The undisputed evidence was that 12-year-old Minor N. thought about hiring a hitman, apparently from Los Angeles or Florida, but he abandoned his plan on realizing it was too flawed. Minor N. denied having any current plan or intent to kill father. Drs. Roeder, Ajami, and Geffner agreed that harm to father was unrealistic. Dr. Davidson offered no opinion on the foreseeability or realistic nature of potential harm to father, and she never disagreed that there was no imminent risk that one of the boys would harm father so long as the children had no contact with him. Dr. Davidson instead took the position that the Ethical Standard requires a psychologist to warn an individual of threats against them *regardless of* the foreseeability of harm. That position ignores and writes the words "foreseeable" and "unavoidable" out of the Ethical Standard, and thus is inconsistent with its plain language.

Thus, while we in no way discount the seriousness of Minor N.'s feelings about father, there is no showing he had a realistic ability to act on them or, more important, that he planned to act on them such that there was a foreseeable, unavoidable risk of harm. He denied such a plan, and Drs. Ajami, Geffner, and Roeder agreed there was no risk if Minor N. did not have contact with father. There was no evidence to the contrary. Thus, the evidence did not support the trial court's conclusion that Dr. Geffner violated Ethical Standard 3.04.

For the same reason, we find no violation of any duty to warn as articulated by our Supreme Court in *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 431. *Tarasoff* broadly held that once a therapist determines or reasonably

should have determined that a patient poses a serious danger of violence to others, the therapist has a duty to exercise reasonable care to protect the foreseeable victim.[16]  But as we have said, there was no evidence that either child posed a serious danger of violence to father, and thus there was no duty to warn under *Tarasoff*.

Otherwise, the trial court did not address foreseeability of harm to father or evaluate it in the context of the Ethical Standards.  Instead, the trial court found that because Dr. Geffner required father be told about Minor N.'s suicidal and homicidal ideations, there necessarily was a duty to warn; that is, the warning established the duty.  The trial court also found irreconcilable Dr. Geffner's directive that father be told of the children's "feelings and statements with respect to possible harm" with Dr. Roeder's testimony that any risk to father was unrealistic.  But the two are not irreconcilable:  even if the children could not realistically hire a hitman to kill their father,

---

[16]     After the *Tarasoff* decision, the Legislature enacted Civil Code section 43.92, which provides that a psychotherapist is not liable for failing to protect against a patient's violent behavior unless the patient has told the therapist about a serious threat of violence against a reasonably identifiable victim.  Civil Code section 43.92 was intended to limit *Tarasoff* and to strike "a reasonable balance in that it does not compel the therapist to predict the dangerousness of a patient.  Instead, it requires the therapist to attempt to protect a victim under limited circumstances, even though the therapist's disclosure of a patient confidence will potentially disrupt or destroy the patient's trust in the therapist." (*Ewing v. Goldstein* (2004) 120 Cal.App.4th 807, 817.)  Civil Code section 43.92 governs civil liability, and thus it is not relevant to our analysis.

it was still critically important that he, as a parent with joint legal custody and visitation rights, be told that seeing him caused the children to have harmful thoughts.  This is what the final sentence in Dr. Geffner's recommendation is about:  harm was not foreseeable or unavoidable if the children did not have contact with father.

We therefore conclude that while Dr. Geffner generally had a duty to warn others of foreseeable and unavoidable harm, he did not violate any duty owed to father.

## DISPOSITION

The judgment is reversed with the direction to the trial court to grant the petition for a writ of administrative mandamus and to reverse the Board's findings.  Dr. Geffner may recover his costs on appeal.

## CERTIFIED FOR PUBLICATION

EDMON, P. J.

We concur:

EGERTON, J.

ADAMS, J.